# DECLARATION

I, Justin B. Trogdon, a Task Force Officer with the Drug Enforcement Administration (DEA), in Greensboro, North Carolina, hereby state pursuant to Title 28, U.S.C. § 1746, under penalty of perjury and pursuant to the laws of the United States, that the following information is true and correct to the best of my knowledge, information and belief:

1. I am a federal law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and make arrests for offenses enumerated in Title 21, United States Code.

2. I have been a Task Force Officer with DEA since April 2019, and am currently assigned to the Greensboro Resident Office. I have been a sworn law enforcement officer with the Randolph County Sheriff's Office (RCSO) since 2004. Since 2005, I have been assigned to criminal investigations, with the primary responsibilities to investigate drug violations, murder, robberies, rape, property crimes and other related felonious crimes. I have held the rank of Detective Sergeant since October 2019. I have a bachelor's degree in Criminal Justice from Western Carolina University. I am currently enrolled at East Carolina University, pursuing a master's degree in Criminal Justice and Administration of Justice.

3. I have completed over 2,100 hours of law enforcement related training, including training in the purchase of narcotics through the use of confidential sources. I



GOVERNMENT EXHIBIT A

have attended a Police Law Institute class that focused on police search and seizure. I am a Field Training Officer for RCSO and a North Carolina Training and Standards Certified General Instructor, and I have been responsible for training new law enforcement officers since February 2010. I have an Advanced Law Enforcement Certificate from the North Carolina Sheriff's Training and Standards Commission. I have participated in hundreds of cases involving violations of laws governing controlled substances including cocaine hydrochloride, cocaine base (also known as crack cocaine), marijuana, heroin, ecstasy, various prescription pills, and methamphetamine.

4. Through my training and experience, I am aware of the ways controlled substances are packaged, distributed, and sold. I am also familiar with how drug proceeds are concealed in order to prevent detection by law enforcement.

5. This declaration is submitted in support of a Verified Complaint of Forfeiture of $67,750.00 in U.S. Currency seized on July 15, 2021, from the possession of Ashley WELCH.

6. The facts and circumstances set forth in this Declaration are based upon information provided by other law enforcement officers, and my own personal knowledge and experience. Since this Declaration is being submitted for the limited purpose of establishing probable cause for forfeiture, it does not necessarily set forth all facts and information that I have learned or obtained during the course of this investigation.

7. Based upon the facts set forth below, there is probable cause to believe that the $67,750.00 in U.S. Currency is subject to forfeiture pursuant to 21 U.S.C. § 881 and 18 U.S.C. § 981.

2

8. On July 15, 2021, at approximately 4:15 p.m., Detective Kyle Gabby of RCSO observed a 2012 Honda Accord vehicle reported to have been stolen travelling southbound on Interstate 85 in Trinity, North Carolina. Detective Gabby activated his emergency equipment and conducted a stop near mile marker 106. Detective Brooks Julian and Lieutenant Eric Wilson of the RCSO, and Officer Andrew Lanier of the High Point Police Department (HPPD) assisted with the stop.

9. The information available to the officers at the time of the stop indicated that the vehicle had recently fled from the police in Greensboro, North Carolina, and the occupants were believed to be armed and dangerous. Greensboro Police Department (GPD) dispatch advised Detective Gabby that the vehicle was entered into National Crime Information Center by their agency.

10. Detective Gabby ordered the driver, Ashley WELCH, out of the vehicle, and she complied. WELCH was handcuffed and placed in the front seat of Detective Gabby's patrol vehicle. WELCH was determined to be the sole occupant of the vehicle.

11. Detectives Gabby and Julian took an administrative inventory of the vehicle and its contents in preparation of it being towed at the request of GPD. Among the items found in the vehicle was a black bookbag that was located on the floor behind the front passenger seat. Detective Gabby opened the black bookbag and observed an open white cloth drawstring bag that contained a bulk amount of U.S. Currency later determined to be $67,750.00. The U.S. Currency was organized into rubber-banded stacks separated by denomination, and therefore was packaged in a manner consistent with drug proceeds.

3

12. Officer Lanier responded to the scene with his police canine, K9 Echo, and performed an open air sniff of the vehicle. After sniffing the seams of the driver's door, K9 Echo lowered himself into a seated position and stared at the door. Officer Lanier advised that K9 Echo positively alerted and demonstrated a change in behavior consistent with the presence of an odor of narcotics. However, no narcotics were located within the vehicle.

13. Officer Lanier has been employed by HPPD since July of 2004. In October 2007, he was assigned to the Criminal Interdiction Task Force. Officer Lanier has attended over 740 hours of narcotics/interdiction-related training. He has made over 530 drug-related arrests, and seized millions of dollars in drug proceeds and over 40 firearms. Officer Lanier has instructed thousands of law enforcement officers on criminal interdiction, both in the classroom while actively working highways and interstates.

14. Officer Lanier has completed over 400 hours of canine handler training in the use of narcotics detection canines, including three 120-hour Basic Canine Handler Schools, a 24-hour Advanced Working Dog Seminar, three 40-hour K9 Seminars, an 8-hour K9 legal update class, and two 8-hour "Supervising a K9 Team" classes. He was assigned his third police canine, K9 Echo, in June 2018. In February 2020, he successfully completed a 160-hour K9 Trainers School at K2 Solutions and was named as a HPPD canine trainer. He has successfully demonstrated the ability to properly deploy and maintain a police canine, and has effectively used his training to locate concealed controlled substances, including marijuana, heroin, powder and crack cocaine, methamphetamine, and ecstasy.

4

15. K9 Echo is a 3-year-old Belgian Malinois, a breed specifically selected for their keen senses and ability to be trained to detect the odor of controlled substances. Officer Lanier conducted all the initial training of K9 Echo under the supervision of a K9 trainer, and trains with K9 Echo on a weekly basis under the direction of other certified trainers. K9 Echo has proved to be reliable using his senses to locate narcotic training aids of actual controlled substances. K9 Echo successfully completed a 120-hour basic canine handler course and passed an in-house K9 certification. K9 Echo is also certified through the National Narcotic Drug Detector Dog Association, which requires the handler and the K9 to successfully locate unknown hides of marijuana, cocaine, heroin, and methamphetamine. Through his training, K9 Echo also can detect MDMA or ecstasy. K9 Echo is trained to sit and stare at the area where he detects the odor of a controlled substance listed above as a positive alert or indication. K9 Echo has reliably detected narcotics and U.S. currency that have been concealed inside automobiles and residential homes. K9 Echo also has successfully demonstrated the ability to detect narcotics inside hidden compartments.

16. When questioned by Detective Gabby, WELCH stated she was on the way to get her two minor children from a daycare in Greensboro (the name and location of which are known but not disclosed here for privacy) and then to the Great Wolf Lodge in Charlotte, North Carolina, to pay for an upcoming birthday party for her daughter. WELCH stated that she was supposed to be at the daycare by 5:00 p.m., and that it closes at 6:00 p.m. WELCH also stated that she did not own the vehicle.

5

17. When she was stopped by Detective Gabby at approximately 4:15 p.m., WELCH was in Trinity, North Carolina, approximately 15 miles south of the daycare in Greensboro, travelling in the opposite, southerly direction.

18. WELCH later stated that she was going to the Great Wolf Lodge first and then "coming right back" to pick up her children at the daycare in Greensboro. No child seats were observed within the vehicle.

19. When asked about the bulk U.S. Currency in the black backpack, WELCH stated that the money was given to her that day by an individual named Jason RICHARDSON, who is the father of her children, to pay for a birthday party at the Great Wolf Lodge. WELCH stated that she did not have a reservation for the party at the Great Wolf Lodge. When asked how much money was in the bag, WELCH estimated between one thousand dollars ($1,000) and five thousand dollars ($5,000).

20. In response to questioning, WELCH stated that RICHARDSON's date of birth is xx/xx/1985, and that he operates an all-cash lawn and fencing business and receives money under the table. WELCH further stated that RICHARDSON gives her money in plastic bags, and that she does not ask him how much he makes. WELCH stated that she is not in a relationship with RICHARDSON. When asked where she received the money from RICHARDSON, WELCH indicated that she would not be answering any more questions.

21. Detective Gabby advised WELCH that the U.S. Currency would be seized. WELCH was released with an inventory of seized property. The vehicle was towed per GPD's request.

6

22. Upon information and belief, the individual referred to by WELCH is Jason Lamar RICHARDSON, of Greensboro, North Carolina. RICHARDSON's date of birth matches the date given by WELCH. RICHARDSON's criminal history includes arrests for assault by strangulation with a minor present and assault on a female in which WELCH was listed as the victim.

23. A review of RICHARDSON's prior criminal drug history includes arrests for felony possession of cocaine and felony possession of a Schedule I controlled substance in 2011; felony possession of heroin in 2013; possession with intent to sell or deliver cocaine and possession of drug paraphernalia in 2015; felony possession of heroin in 2016; and possession with intent to manufacture, sell, or distribute a Schedule I controlled substance and possession of a Schedule IV controlled substance in February of 2020. On April 4, 2020, RICHARDSON was found guilty of possession with intent to sell or deliver marijuana and possession of marijuana paraphernalia.

24. The U.S. Currency was transported to the Archdale Police Department where it was subjected to a blind hide, open air sniff by K9 Echo. The U.S. Currency was placed into a brown paper bag and placed onto the floor along with three other empty brown paper bags. Officer Lanier then deployed K9 Echo. K9 Echo indicated a positive alert to the odor of controlled substance on the bag containing the U.S. Currency.

25. On July 23, 2021, the U.S. Currency was transported to the State Employees Credit Union branch in Archdale, North Carolina, where it was determined to be $67,750.00. A check was made out to the U.S. Marshals and deposited to the U.S. Marshals Service Seized Assets Deposit Fund.

7

Case 1:21-cv-00956-UA-JEP   Document 1-1   Filed 12/16/21   Page 7 of 9

26. DEA adopted the seizure of $67,750.00 in U.S. Currency and began administrative forfeiture proceedings. Notice of the forfeiture proceeding was posted on the internet at www.forfeiture.gov for a period of thirty days commencing on September 13, 2021 and ending on October 13, 2021.

27. On September 29, 2021, DEA received a claim to the U.S. currency defendant property from WELCH. In her claim, WELCH stated that when stopped by police on July 15, 2021, she was "on my way down the highway with high hopes of going to Charlotte, Nc and trying to put money down on a home I seen there, I was also on the way to pay for my daughters [sic] birthday party …" and that she "had a few homes to visit when I got [to Charlotte] …."

28. When questioned at the time of the stop, WELCH did not mention any plan to see houses or make a down payment on a home in Charlotte.

29. Upon receipt of the claim, the administrative process was terminated, and the seizure was referred to the United States Attorney's Office for judicial forfeiture.

## CONCLUSION

30. Based upon the foregoing, there is probable cause to believe that the $67,750.00 in U.S. Currency was furnished or intended to be furnished in exchange for a controlled substance, in violation of the Controlled Substances Act, 21 U.S.C. §§ 801 *et seq.*, or represents proceeds traceable to such an exchange, and is therefore subject to

forfeiture pursuant to 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1)(C).

This the 16th day of December, 2021.

Justin B. Trogdon
Task Force Officer
Drug Enforcement Administration